# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 13-1374


**HAYES FUND FOR THE FIRST UNITED METHODIST CHURCH OF WELSH, LLC, ET AL.**

**VERSUS**

**KERR-MCGEE ROCKY MOUNTAIN, LLC, ET AL.**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. 520-09
HONORABLE C. STEVE GUNNELL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## PHYLLIS M. KEATY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, Billy Howard Ezell, and Phyllis M. Keaty, Judges.


**REVERSED AND RENDERED.**

**J. Michael Veron**
**Jere Jay Bice**
**Alonzo P. Wilson, Jr.**
**Veron, Bice, Palermo & Wilson, LLC**
**721 Kirby Street**
**Lake Charles, Louisiana 70601**
**(337) 310-1600**
**Counsel for Plaintiffs/Appellants:**
      **Hayes Fund, First United Methodist Church of Welsh, LLC**
      **Rice Acres, Inc.**
      **Lori Beth Hayes Lemons**
      **Jodi Lee Hayes Oliver**
      **Terry Glen Hayes**
      **Hollis Kay Hayes Hassien**
      **Cody William Hayes**

**Shayna L. Sonnier**
**Hunter, Hunter & Sonnier**
**1807 Lake Street**
**Lake Charles, Louisiana 70601**
**(337) 436-1600**
**Counsel for Plaintiffs/Appellants:**
      **Hayes Fund, First United Methodist Church of Welsh, LLC**
      **Rice Acres, Inc.**
      **Lori Beth Hayes Lemons**
      **Jodi Lee Hayes Oliver**
      **Terry Glen Hayes**
      **Hollis Kay Hayes Hassien**
      **Cody William Hayes**

**Jon W. Wise**
**Wade P. Webster**
**Fowler, Rodriguez, Valdes-Fauli**
**400 Poydras Street, Thirtieth Floor**
**New Orleans, Louisiana 70130**
**(504) 523-2600**
**Counsel for Defendants/Appellees:**
      **Anadarko Petroleum Corporation**
      **Southern G. Holdings, L.L.C.**
      **Kerr-McGee Oil & Gas Onshore, LP**
      **Crimson Exploration Operating, Inc.**

**John P. Farnsworth**
**Brooke C. Tigchelaar**
**Stone Pigman Walther Wittmann L.L.C.**
**546 Carondelet Street**
**New Orleans, Louisiana 70130-3588**
**(504) 581-3200**
**Counsel for Defendant/Appellee:**
      **Noble Energy, Inc.**

**Jefferson D. Stewart**
**William D. Shea**
**Adams and Reese, LLP**
**450 Laurel Street, Suite 1900**
**Baton Rouge, Louisiana  70801**
**(225) 336-5200**
**Counsel for Defendant/Appellee:**
        **Aspect Resources, LLC**

**Elton F. Duncan, III**
**Duncan, Courington & Rydberg**
**400 Poydras Street, Suite 1200**
**New Orleans, Louisiana  70130**
**(504) 524-5566**
**Counsel for Defendant/Appellee:**
        **M & R Management Corporation**

**KEATY, Judge.**

This complex dispute arises out of a Petition for Damages filed by plaintiffs, Rice Acres, Inc.; the Hayes Fund for the First Methodist Church of Welsh, L.L.C.; Hollis Kay Hayes Hassien; Terry Glen Hayes; Cody William Hayes; Jodi Lee Hayes Oliver; and Lori Beth Hayes Lemons (hereafter Hayes Fund). Named defendants in the lawsuit are Aspect Resources, LLC; Noble Energy, Inc.; Crimson Exploration Operating, Inc. (hereafter Crimson); Southern G. Holdings, L.L.C.; Anadarko Petroleum Corporation; Kerr-McGee Oil & Gas Onshore, LP; and Kerr-McGee Rocky Mountain, LP (hereafter all defendants collectively referred to as Kerr-McGee). In sum, Hayes Fund contends that Kerr-McGee failed to follow the proper, customary, and industry-wide accepted protocol for drilling the two oil and gas wells at issue, i.e., Rice Acres No. 1 (hereafter Rice Acres well) and Hayes Lumber No. 11-1 (hereafter Hayes Lumber well). In so doing, it alleges that Kerr-McGee left valuable hydrocarbons unrecoverable resulting in substantial pecuniary damages to Hayes Fund.

The trial of this case consumed approximately twenty-five days of testimony scattered over a ten-month period from February through December of 2012. Hayes Fund submits that complex evidence was taken "in bits and pieces with multiple court sessions spread across an eleven-month period." Trial sessions ranged in length from one and a half days to one week at a time. Much of the evidence received by the trial court involved highly technical testimony by numerous expert witnesses. Post-trial briefs submitted to the trial court on February 8, 2013, consisted of more than two hundred pages. The trial court issued its six-page reasons for ruling (reasons) on May 1, 2013. On May 28, 2013,

a judgment was signed in favor of Kerr-McGee, dismissing all of Hayes Fund's claims with prejudice.

Hayes Fund herein appeals the judgment of the trial court. For the reasons set forth hereafter, we reverse the trial court's judgment, render judgment in favor of Hayes Fund, and award damages in the amount of $13,437,895.00.

## FACTS AND PROCEDURAL HISTORY

The Rice Acres well was drilled in 1999 by its original operator, H.S. Resources (hereafter HSR). The Rice Acres well produced hydrocarbons from the Hackberry formation reservoir until the well ceased production in 2004. The cessation of the well's production was allegedly caused when water zones from the original wellbore mixed with oil and gas zones produced by the sidehole.

The Hayes Lumber well was also drilled in 1999 by HSR. It produced from the lower zone in the Nodosaria formation from January of 2000 until May of 2007. The lower zone was allegedly abandoned due to sanding problems. Thereafter, HSR performed a workover of the well from May of 2007 until January of 2008, enabling production from a different location, the upper zone of the Nodosaria formation, from March of 2008 until production ceased on November 30, 2008. It is alleged that production of the Hayes Lumber well ceased as a result of extraneous water entering the well through casing leaks caused by prior sanding problems. Hayes Fund alleges that Kerr-McGee, through various oil leases, operated both wells. More importantly, Hayes Fund contends that Kerr-McGee operated the wells in an imprudent manner in violation of La.R.S. 31:122,[1]

---

[1] Louisiana Revised Statutes 31:122 provides:

> A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself

resulting in damage to the reservoirs beneath the two wells. Hayes Fund alleges that Kerr-McGee caused it to sustain substantial pecuniary damages in the form of lost royalties and that Kerr-McGee is responsible for its losses.

## ASSIGNMENTS OF ERROR

Hayes Fund sets forth eight assignments of error:

(1)    the trial court erred in finding that adequate zonal isolation was attained when cement was pumped into the original Rice Acres well. Hayes Fund contends that this finding was based on the trial court's erroneous conclusions that:

    (a)    industry-wide requirements which would ensure a good cement job and provide zonal isolation were inapplicable to cementing drill pipe in the wellbore; and,

    (b)    Hayes Fund's expert failed to dispute that the amount of vertical cement in place was sufficient;

(2)    the trial court erred in finding that chloride levels found in the water produced from the Rice Acres well proved that the water was not extraneous;

(3)    the trial court erred in holding that the collateral attack doctrine was inapplicable;

(4)    the trial court erred in ruling that Hayes Fund was required to prove that Kerr-McGee's operations were imprudent since the leases provided that the landowners only needed to prove causation and damages;

(5)    the trial court erred in finding that the simultaneous use of multiple permanent packers in the Hayes Lumber well was "planned with certain production advantages in mind" and was reasonable;

(6)    the trial court erred in concluding that there was no evidence that Kerr-McGee should have known that the Hayes Lumber well would sand up and that Hayes Fund's expert offered no authority to support his testimony to that effect;

---

and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.

(7)     the trial court erred by requiring Hayes Fund to prove the location of leaks in the Hayes Lumber well; and,

(8)     the trial court erred in finding that Hayes Fund failed to offer supporting evidence or authorities to support its claims.

## STANDARD OF REVIEW

Appellate courts apply the manifest error standard of review in civil cases. *Detraz v. Lee*, 05-1263 (La. 1/17/07), 950 So.2d 557.  In *Detraz*, 950 So.2d at 561, the supreme court stated:

> In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous.

The *Detraz* court further concluded that an appellate court cannot "re-weigh the evidence or substitute its own factual findings because it would have decided the case differently." *Id.*  "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong, even if the reviewing court would have decided the case differently." *Id.*

> The effect and weight to be given to expert testimony rests within the broad discretion of the trier of fact.  Credibility determinations, including the evaluation and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which should not be disturbed on appeal in the absence of manifest error.

*Vaughn v. Progressive Sec. Ins. Co.*, 03-1105, p. 13 (La.App. 3 Cir. 3/2/05), 896 So.2d 1207, 1219 (citations omitted).

On the other hand, "[a]ppellate courts review a trial court's conclusion regarding a question of law to determine whether the conclusion is legally correct." *Latiolais v. Bellsouth Telecomms., Inc.*, 11-383, p. 4 (La.App. 3 Cir. 10/5/11), 74 So.3d 872, 875.  The flawed legal conclusions shall be reviewed de novo if the conclusions are found to be incorrect. *Id.*

4

Assignments of error one, two, five, six, and seven all contain issues of fact and will be discussed in that order utilizing the manifest error standard of review. Assignments of error three and four will be discussed utilizing the de novo standard of review.[2]

**DISCUSSION**

## I.    Adequate Zonal Isolation – Rice Acres Well

Hayes Fund contends that Kerr-McGee negligently caused the drill pipe to become irretrievably stuck in the wellbore and its actions thereafter created a pathway for extraneous water to encroach on the Hackberry gas sand. In support of its position, Hayes Fund introduced into evidence learned articles and papers as well as petroleum-engineering handbooks and practice manuals setting out the recommended cementing practices as well as information regarding zonal isolation and petroleum well construction. These authorities included reference materials from the Petroleum Engineering Handbook, the American Petroleum Institute Recommended Practice Series, and other books.

To understand Hayes Fund's contentions, one must first understand the purpose of zonal isolation and have a rudimentary understanding of how it works. Zonal isolation is the process of excluding gas, water, and other fluids located in one zone from oil located in another zone in a well. D.G. Calvert, Well Cementing 1 (Erik B. Nelson & Dominique Guillot eds., 2nd ed. 2006). Cement designed specifically for this purpose is placed between the casing and the wellbore to provide zonal isolation throughout the life of a well. Ron Crook, Halliburton, *Cementing*, *in* 2 Petroleum Engineering Handbook:  Drilling Engineering 369

---

[2] Although not addressed individually, assignment of error number eight is addressed throughout this opinion.

(Robert F. Mitchell & Larry W. Lake eds., 2007). Although not related to production, zonal isolation is necessary to production operations. *Id.*

The Petroleum Engineering Handbook further provides that zonal isolation is achieved through ensuring an effective cement job. *Id.* Cementing is the process of mixing specialized cement and water and pumping it down through a casing. *Id.* A good cement job is achieved through pipe movement and centralization. *Id.* Pipe movement, either by reciprocation or rotation, assists in effective mud removal. Isolating Potential Flow Zones During Well Construction, API Recommended Practice 65-Part 2 38 (American Petroleum Institute, 1st ed. 2010). Pipe movement aids in removing mud by altering the flow path of the cement slurry, spacers, and mud. *Id.* Pipe movement further breaks "the gel strengths of mud that may otherwise be bypassed by the spacer and slurry." *Id.*

Centralization is the process of using mechanical centralizers in casing across the intervals to be isolated in order to optimize the displacement of drilling fluid. Isolating Potential Flow Zones During Well Construction, API Recommended Practice 65-Part 2 36 (American Petroleum Institute, 1st ed. 2010). When a pipe is not centralized, it leans and touches the side of the wellbore. *Id.* As the path of least resistance is the wide side of the pipe, drilling fluid can remain on the narrow side rather than being displaced by cement. *Id.* The residual mud can provide a pathway for fluids, including extraneous water, to travel up or down the wellbore. Robert Beirute & Larry T. Watters, *Formation-Fluid Migration After Cementing*, *in* Petroleum Well Construction 344 (Michael J. Economides et al. eds., 1998). This can destroy zonal isolation. Isolating Potential Flow Zones During Well Construction, API Recommended Practice 65-Part 2 28 (American Petroleum Institute, 1st ed. 2010).

Centralization is measured in terms of standoff percentage, and the minimum standoff percentage needed for a good cement job is 70% to 75%. Ron Crook, Halliburton, *Cementing*, *in* 2 Petroleum Engineering Handbook: Drilling Engineering 374 (Robert F. Mitchell & Larry W. Lake eds., 2007); Gerard Daccord et al., Well Cementing 164 (Erik B. Nelson & Dominique Guillot eds., 2nd ed. 2006). Drilling fluid removal is increased when there is good pipe standoff, thereby equalizing forces exerted by cement flowing up the annulus. Isolating Potential Flow Zones During Well Construction, API Recommended Practice 65-Part 2 71 (American Petroleum Institute, 1st ed. 2010).

Hayes Fund asserts that the trial court erred in concluding that cement pumped into the original Rice Acres wellbore provided adequate zonal isolation. Hayes Fund contends that the trial court's foregoing finding was based on its erroneous conclusions that: (1) industry-wide requirements for a good cement job to accomplish zonal isolation did not apply to cementing drill pipe in the wellbore and (2) Hayes Fund's expert, William Griffin[3] (hereafter Griffin), failed to dispute Kerr-McGee's allegations that the amount of vertical cement in place was sufficient.

In opposition, Kerr-McGee contends that none of the authorities relied upon by Griffin applied to setting cement around stuck pipe. Further, Kerr-McGee asserts that the evidence supports the trial court's finding that enough vertical cement was in the original wellbore to form a barrier to fluid migration.

In its reasons, the trial court stated that the evidence supported a finding that the drill pipe was centralized at certain points and that the amount of vertical

___

[3] Griffin was accepted by the trial court as an expert in the field of petroleum engineering with the subspecialty of drilling, reservoir production, marketing, and economic evaluation and safety.

cement in the wellbore necessary to form a barrier to fluid migration was in place. Additionally, the trial court noted, "Mr. Griffin did not dispute these facts." We disagree.

## A. Cementing Stuck Pipe and Zonal Isolation

At trial, it was undisputed that the pipe was stuck in the wellbore. Hayes Fund's expert, Griffin, opined that cementing stuck pipe, as opposed to pipe that is not stuck, prohibits effective zonal isolation. The articles and "different authorities" cited by Griffin and dismissed by the trial court in its reasons establish that casing movement, by reciprocation, rotation, or both, improves the quality of cement jobs.

In its reasons, the trial court found that Kerr-McGee acted "imprudently when it allowed the pipe to become stuck in the original [Rice Acres] wellbore." Hayes Fund presented multiple resources pertaining to industry protocol establishing that pipe movement allows for centralization of the pipe which significantly contributes to an effective cementing of the well, thereby, ensuring zonal isolation. Due to the pipe being stuck, it should have been anticipated that cementing the stuck pipe would not provide effective zonal isolation. The record clearly supports Hayes Fund's expert, Griffin, in this regard.

Despite the plethora of information provided to the trial court in support of his testimony, the trial court dismissed Griffin's conclusions. In fact, the trial court dismissed the authorities cited by Hayes Fund as simply being inapplicable to the case at bar. In so doing, the trial court, in its reasons, stated, "[n]one of the articles or snippets, however, applied to setting a cement plug around a stuck drill pipe." We find that this is an unsupported, artificial distinction without a difference. The record is devoid of evidence supporting the trial court's distinction. Rather,

testimony was received that the type of pipe is insignificant with respect to the principles behind cementing to achieve zonal isolation. Griffin stated that the cementing of casing applied equally to stuck drill pipe. Both Hayes Fund's and Kerr-McGee's experts testified that the physics of cement flow around pipe is the same regardless of the type of pipe involved.

Kerr-McGee's witness, Adam Blum (hereafter Blum), was employed by HSR as a drilling superintendent. He worked on the Rice Acres well. In his videotaped deposition that was admitted into evidence at trial, Blum stated that once the pipe became irretrievably stuck, HSR knew the risk of extraneous water destroying the Hackberry gas zone and the need to isolate the gas zone from the water zone above and below. However, its error in ignoring high pressures during the original drilling operation indicating that it would "differentially stick" the drill pipe, thus, resulting in the stuck pipe, rendered it impossible to achieve zonal isolation and precluded the use of universally accepted practices essential for an effective cement job.

The trial court's conclusion that industry standards, providing for centralization and pipe movement as essential for a good cement job, does not apply to the cementing of pipe as opposed to production casing is clearly contrary to the evidence. Accordingly, the trial court was manifestly erroneous in finding that the cement pumped into the original Rice Acres wellbore provided adequate zonal isolation. The trial court's finding is grounded upon the erroneous conclusion that industry-wide criteria for an effective cement job to assure zonal isolation did not apply to cementing drill pipe in the wellbore.

## B.    Sufficient Vertical Cement

Hayes Fund asserts that the trial court erred in concluding that its expert did not dispute the allegation that the amount of vertical cement in the wellbore necessary to form a barrier to fluid migration was in place.  Our review of the record finds that Griffin did indeed dispute this allegation.  On direct examination, Griffin testified that "the only way that the Hackberry can communicate in this area in the original hole is due to the poor to no primary -- or cement in the annular space behind that drill pipe."  Further, Griffin stated that the extraneous water is "most likely coming from the abandoned original hole with the poor cementing job."  Accordingly, Hayes Fund's expert disputed the allegation that there was enough vertical cement in the wellbore to form a fluid migration barrier.

As to the centralization of the pipe, Griffin agreed with Kerr-McGee's expert witness, Don Bazer (hereafter Bazer), that the three stabilizers on the drill pipe act as centralizers.  However, Griffin explained that the stabilizers were not in the proper position to centralize the pipe across the gas reservoir.  He further testified that the stabilizers were not located where they could be effective in isolating the Hackberry reservoir from communication with nearby water zones either up or down the wellbore.  Clearly, Griffin disputed the allegation that the pipe was centralized at certain points.

Accordingly, the trial court was manifestly erroneous in concluding that Hayes Fund's expert failed to dispute Kerr-McGee's position that the pipe was centralized at certain points and that the amount of vertical cement in the wellbore necessary to form a barrier to fluid migration was in place.

10

## II.    <u>Chloride Levels and Extraneous Water – Rice Acres Well</u>

In its second assignment of error, Hayes Fund contends that the trial court erred in concluding that the chloride levels in the water produced from the Rice Acres well indicate that the water was not extraneous water.

The trial court accepted the testimony of Kerr-McGee's expert, Michael McKenzie (hereafter McKenzie), who testified that the Rice Acres Hackberry reservoir was water driven and was not subject to extraneous water from other zones. Further, McKenzie stated that the water produced had chloride counts consistent with the counts of the water in the reservoir. The trial court considered this fact to support Kerr-McGee's position that the water was from the reservoir. We disagree.

Testimony received at trial from experts of both parties established that there was no significant difference between the salinity of the water inside and outside of the reservoir. Chloride level, however, is a measure of the salinity of the water according to the experts' testimony. Thus, the trial court erred in its finding that the chloride counts in the water support Kerr-McGee's position that the water was from the reservoir and not due to migration from a higher or lower zone.

Accordingly, the trial court was manifestly erroneous in concluding that chloride levels in the water produced from the Rice Acres well supported a finding that the water was not extraneous in nature.

## III.    <u>Simultaneous Permanent Packers – Hayes Lumber Well</u>

In its fifth assignment of error, Hayes Fund contends that the trial court erred in finding that the simultaneous use of multiple permanent packers in the Hayes Lumber well was "planned with certain production advantages in mind" and was reasonable.

The trial court's reasons state:

After reviewing the testimony and memoranda, it is evident that the plaintiffs have not only neglected to demonstrate that the multiple packer configuration resulted in reservoir damage, they also failed to offer any evidence that the design was unreasonable in the first place. On direct examination, Mr. Griffin did not introduce any authority showing that a multiple packer configuration was disfavored or unknown in the industry. On the other hand, KERR-McGEE's witnesses and exhibits emphasized the fact that the multiple packer design was planned ahead of time with certain production advantages in mind and was quite reasonable.

Hayes Fund argues that HSR perforated the casing wall and cement at three production zones during the well's initial completion. According to Blum's videotaped deposition testimony, it was perforated at 9990-92 feet, at 9972-74 feet, and at 9890-95 feet. Blum also testified that HSR then placed a permanent packer above each of the perforations.[4] Hayes Fund contends that this configuration was unreasonable.

Our review of Blum's testimony shows that he claimed to have first-hand knowledge of the reasoning behind the completion of the Hayes Lumber well. Blum testified that he worked on the Hayes Lumber well in December of 1999. He stated that he had experience working on similar wells that had multiple productive zones although they were produced only one at a time.

With respect to the Hayes Lumber well, Blum testified that geologists initially identified six or seven productive zones. Blum testified that they were hoping to "test each zone individually, and, if we found a productive zone, we would stop and produce it." If the zone was not productive, they would "set a plug on top of the isolation packer instead of having to kill the well[ and] trip the

---

[4] A packer is a "device that can be run into a wellbore with a smaller initial outside diameter that then expands externally to seal the wellbore. Packers employ flexible, elastomeric elements that expand. The two most common forms are the production or test packer and the inflatable packer." Schlumberger Oilfield Glossary (last visited August 5, 2014), http://www.glossary.oilfield.slb.com/en/Terms/p/packer.aspx.

12

tubing." Setting a plug on top of that packer just above a zone and moving forward with another perforation would have been consistent with Blum's prior experience of producing productive zones one at a time. After realizing at trial that three permanent packers were simultaneously set above three productive zones, Blum testified that he just did not remember "why we perforated all three of them. That's what I'm sitting here trying to figure out. Instead of one at a time."

Thus, Blum's testimony directly conflicts with the trial court's finding "that the multiple packer design was planned ahead of time with certain production advantages in mind." To the contrary, Blum admitted that they typically produced zones one at a time and not simultaneously. Blum was perplexed by the simultaneous use of three permanent packers in this case and admitted that he could not explain why it was done.

In an effort to prove that the design used in the Hayes Lumber well was not unusual, Kerr-McGee offered the testimony of Julio Cabrera (hereafter Cabrera), Crimson's petroleum engineer, as well as a list of other wells presumably employing the "multiple packer design." On cross-examination, Cabrera conceded that these other wells were different from the Hayes Lumber well because they did not involve three zones produced simultaneously with three permanent packers.

Notably, Cabrera testified that he had seen this triple isolation packer completion "[o]n other wells . . . that HS Resources had drilled and completed in the area." However, he stated that he was unable to say whether any of these other wells produced out of multiple formations simultaneously.

The foregoing testimony and evidence reveals that the three-packer configuration was not only unusual, but also unreasonable. The trial court, however, found that the design was "quite reasonable." In its reasons, the trial

court stated: "Thus, the defendants executed a plan based upon their understanding of the well: that in an area of water drive reservoirs, one could reasonably anticipate that one or more of the three producing zones could water out."

The trial court's justification that the design of the three-packer configuration was reasonable was based on its assumption that Kerr-McGee believed the reservoir was water-driven and it would water out from the bottom up. Thus, we must determine whether there was evidence that Kerr-McGee believed that the reservoir was water-driven.[5]

The record contains a "Property Evaluation Form" which was submitted into evidence by Hayes Fund. This evaluation of the Hayes Lumber well states that the "[d]rive mechanism is depletion." Kerr-McGee called Scott Bailey (hereafter Bailey) to testify as a lay witness. Bailey testified on behalf of Aspect Management Corporation[6] (hereafter Aspect Management) and discussed the origin of this form. Bailey testified that the form was prepared in conjunction with the sale of the Hayes Lumber Company 11-1 lease by Aspect Management in 2001. On cross-examination, Bailey was questioned as to the language in the form that says the "[d]rive mechanism is depletion." Bailey explained that the form contained "supporting arguments" for finding that the well was depletion-driven.

---

[5] Water drive is "the reservoir drive mechanism in which oil is produced by the expansion of the underlying water and rock, which forces the oil into the wellbore. In general, there are two types of water drive: bottom-water drive, in which the oil is totally underlain by water; and edgewater drive, in which only a portion of the oil is in contact with the water." Occupational Safety & Health Administration, U.S. Department of Labor. Dictionary of Petroleum Terms provided by Petex and the University of Texas (last visited August 5, 2014). Retrieved from https://www.osha.gov/SLTC/etools/oilandgas/glossary_of_terms/glossary_of_terms_a.html. Depletion drive, also called gas drive, is "the use of the energy that arises from the expansion of compressed gas in a reservoir to move crude oil to a wellbore." *Id*.

[6] Aspect Resources, L.L.C. is a defendant in this case. Bailey testified that Aspect Resources, L.L.C., is an entity of Aspect Management Corporation.

14

The foregoing testimony clearly establishes that Kerr-McGee did not believe that the reservoir was water-driven, especially since the valuation was performed prior to the instant litigation. In further support, Kerr-McGee's expert, McKenzie, testified regarding Kerr-McGee's exhibit entitled "Volumetric Estimate Of Gas Reserves" by D-O-R Engineering, Inc. This exhibit pertains to the Hayes Lumber well. McKenzie testified as follows:

> Q      And based on all the available information you received in 2000, you estimated that this Upper NOD B recompletion zone was a depletion drive, correct?
>
> A      That's correct.
>
> Q      Okay. And certainly that wasn't just a guess, was it?
>
> A      I don't think so. I believe the -- the geologist and the reservoir engineer that performed this work would have combined their knowledge of the -- the geology and reservoir mechanics to make this estimate.

Accordingly, the trial court was manifestly erroneous in finding that the simultaneous use of multiple permanent packers in the Hayes Lumber well was "planned with certain production advantages in mind" and was reasonable under the circumstances.

## IV.    Was Sanding Reasonably Foreseeable – Hayes Lumber Well?

In its sixth assignment of error, Hayes Fund contends that the trial court erred in concluding that there was no evidence that Kerr-McGee should have known that the Hayes Lumber well would sand up. Further, Hayes Fund alleges that the trial court erred by finding that Griffin failed to offer any authority to support his testimony to that effect.

In its reasons, the trial court stated: "Unfortunately, Mr. Griffin offered no testimony that the defendants should have known that the well would sand up

eventually nor did he offer any authority and/or support for his position that KERR-McGEE should have predicted the sanding of the well."

Kerr-McGee's expert, Calvin Barnhill (hereafter Barnhill), acknowledged that the sanding in of wells is a common problem in south Louisiana and that prudent operators recognize that sanding is a common risk when drilling wells here. Barnhill testified that an operator can obtain information from examining a core analysis which determines the likelihood of sanding. However, Barnhill was unable to explain exactly what an operator should look for in the core analysis that would identify the likelihood of a sanding problem.

Hayes Fund's expert, Griffin, testified on rebuttal that an operator should look at the porosity in the core analysis. He stated that as porosity increases, the likelihood of sanding problems increases due to lack of cementation. A lack of cementation, according to Griffin, means that the sand grains are poorly connected since they are not connected by cement such that the grains can easily move into the wellbore.

Griffin's opinion was based on the 2007 version of the Petroleum Engineering Handbook. This publication provides, in pertinent part, that "[t]he porosity of a formation can be used as a guideline as to whether sand control is needed. If the formation porosity is greater than 30%, the probability of the need for sand control is high because of the lack of cementation." W.L. Penberthy, Jr., Exxon Production Research Co., *Sand Control*, *in* 4 Petroleum Engineering Handbook: Production Operations Engineering 179 (Larry W. Lake & Joe Dunn Clegg eds., 2007). This publication supports Griffin's opinion that there was a likelihood of sanding arising out of a lack of cementation since, in this instance with regard to the Hayes Lumber well, "the average value of porosity from the core

16

data was 30.4 percent." Additionally, Kerr-McGee's own log analysis, which is contained in the record as an exhibit, reveals that the porosity in the lower completion of the Hayes Lumber well was greater than 30%. This log analysis supports Griffin's position that Kerr-McGee should have predicted the sanding in of the well.

Kerr-McGee criticizes Griffin's use of the 2007 version of the Petroleum Engineering Handbook. Specifically, Kerr-McGee notes that the 2007 version was published after the Hayes well was completed. Kerr-McGee further contends that the 2007 version contains some information that could not be found in the predecessor handbook from 1987, regarding industry standards surrounding the use of permanent versus retrievable packers. The record, however, shows that Kerr-McGee failed to offer any other publication indicating that the Petroleum Engineering Handbook revealed new information that was unknown to the oil and gas industry at the time the well was drilled. Kerr-McGee also failed to show any contrary publication or any other evidence discrediting the information contained in the 2007 version.

Accordingly, the trial court was manifestly erroneous in finding that there was a lack of evidence showing that Kerr-McGee should have known that the Hayes Lumber well would sand up and that Griffin offered no authority to support his testimony to that effect.

## V.   Proof of Location of Leaks – Hayes Lumber Well Upper Zone Recompletion

In its seventh assignment of error, Hayes Fund contends that the trial court erred in requiring it to prove the location of leaks in the Hayes Lumber well.

In its reasons, the trial court stated:

17

With regard to the Hayes Lumber recompletion zone (9718'-9742'), the evidence demonstrated that the upper reservoir was a water drive which made it similar to other wells in the area. . . .

At trial, Mr. Griffin was asked directly if he had any evidence that the water was migrating down the annulus from the casing leaks into the perforations. His response was that the only evidence he had was the fact that the water appeared. The Court finds that Mr. Griffin had no evidence to prove the existence or location of leaks below the packer and that it was entirely speculation on his part.

Our review of the record shows that Crimson's engineer, Cabrera, admitted that there were casing holes and/or leaks both above and below the packer. More specifically, Cabrera testified as follows:

Q      Okay. And, certainly, those multiple casing holes, as you alluded to earlier, are sources of communication into the wellbore, correct?

A      They're sources of communication from whatever formation is outside into the wellbore.

Q      And there's multiple formations outside the wellbore in those areas, correct?

A      I mean -- yes.

Q      Okay. And some of those formations contain water, can they not?

A      They can. I can't say whether they do.

Q      Okay. And despite knowing that you had multiple casing holes beneath the packer and above the unset packer, Crimson went ahead and perforated this well in the upper zone from, what was it, 9,718 to 9,730 correct?

A      That's correct.

The foregoing testimony reflects that there were casing leaks both above and below the packer. As such, the trial court erred in finding that Griffin "had no evidence to prove the existence or location of leaks below the packer and that it was entirely speculation on his part."

18

Furthermore, it is immaterial whether the extraneous water entered the well above or below the packer since the damage was the result of Kerr-McGee's imprudent operations. By finding that Hayes Fund had to prove the existence or location of leaks below the packer, the trial court imposed an additional element of proof on Hayes Fund that was not warranted. The trial court rejected Hayes Fund's claims based upon its erroneous conclusion that this extra element of proof, i.e., location of leaks, was not satisfied. Moreover, the trial court failed to recognize that Cabrera's testimony showed that this additional and unwarranted element, i.e., location of leaks, was also satisfied.

Accordingly, the trial court manifestly erred in requiring Hayes Fund to prove the location of leaks in the Hayes Lumber well. However, we observe that Kerr-McGee's witness provided the element of proof for Hayes Fund.

## VI.    Applicability of the Collateral Attack Doctrine – Rice Acres Well

In its third assignment of error, Hayes Fund contends that the trial court erred in holding that the collateral attack doctrine did not apply with respect to the Rice Acres well.

In its reasons, the trial court stated: "However, the Court also finds that despite the defendants' imprudence, HAYES FUND has not demonstrated that there were any damages to the remaining hydrocarbons that could be produced from a replacement well."

Hayes Fund submits that the foregoing conclusion is based upon Kerr-McGee's collateral attack on the Louisiana Commissioner of Conservation's order establishing the boundaries of the reservoir. Hayes Fund argues that Kerr-McGee was allowed to claim that the reservoirs involved were smaller than the dimensions found in the Commissioner's order. Hayes Fund contends that the trial court erred

by allowing this collateral attack on the Commissioner's findings and by relying on this evidence which contradicted the Commissioner's findings.[7]

Louisiana Revised Statutes 30:12 prohibits collateral attacks on the Commissioner's order and factual findings by providing that the exclusive remedy for any review of the Commissioner's order is "a suit for injunction or judicial review against the assistant secretary" of the Office of Conservation. La.R.S. 30:12(A)(1). In *Trahan v. Superior Oil Co.*, 700 F.2d 1004, 1015-16 (5th Cir. 1983) (emphasis added), the collateral attack doctrine is explained as follows:

> The application of this rule prohibiting "collateral attack" of an order of the Commissioner is not limited to suits in which the judgment will directly affect actual enforcement of, or compliance with, the Commissioner's order, such as suits by or against the Commissioner, or suits between private parties for injunctive relief requiring of one party conduct or inaction which will, in fact, violate an order of the Commissioner. *Rather, the rule also extends to suits between private parties in which a particular order of the Commissioner is an operative fact upon which the determination of the parties' respective rights directly depends, even though all relief sought can be given, such as by money damages or lease cancellation, without thereby causing any actual violation of the Commissioner's order.*

On May 23, 2000, HSR sought three orders from the Commissioner regarding its lease rights. One of the orders established a drilling unit which

---

[7] As discussed more extensively in the opinion, and in connection with its lease rights, HSR sought an order from the Commissioner prior to the instant litigation. The order established a drilling and production unit for the Hackberry Zone, Reservoir A, and the Rice Acres well was designated as the unit well. The Commissioner found that the reservoir was approximately 220 acres. The Commissioner's findings as to the 220 acres were based upon HSR's submitted sworn expert testimony and other evidence regarding the dimensions of the underground reservoir. In its appellate brief, Hayes Fund contends that prior to trial, Kerr-McGee was going to disregard the Commissioner's findings. Hayes Fund alleges that Kerr-McGee was going to submit evidence showing that its sworn testimony before the Commissioner, and his findings based on that testimony, were wrong. Hayes Fund contends that Kerr-McGee's experts were going to testify that the reservoir area was smaller than the 220 acres established by the Commissioner's order. Hayes Fund alleges that Kerr-McGee was going to testify that the producing sands in the reservoir were not uniformly distributed across the reservoir. Hayes Fund, therefore, filed a motion in limine seeking an order from the trial court excluding that evidence as a prohibited collateral attack. Hayes Fund contends that at that hearing, the trial court granted their motion. The trial court allegedly took a recess for lunch. After lunch, Hayes Fund alleges that the trial court announced that it had reconsidered its ruling sua sponte and decided to allow Kerr-McGee to collaterally attack the Commissioner's findings.

provided the area that would be drained by the Rice Acres well. The other two orders established two drilling units providing the areas that would be drained by the Hayes Lumber well. Office of Conservation Order Numbers 1448, 1448A, and 1448B are included in the record as exhibits. Pursuant to Order Number 1448, the Commissioner created a drilling and production unit for the Hackberry Zone, Reservoir A, and additionally established the Rice Acres well as the unit well. The Commissioner found that the limits of the reservoir were as shown on an attached plat. According to the plat, the area covered by the reservoir was plus or minus 220 acres. Our review of Order Numbers 1448A and 1448B further shows that the Commissioner created two other drilling and production units for the Nodosaria Sand and lower Nodosaria Sand, Reservoir A, and also established the Hayes Lumber well as the unit well. The Commissioner found that the limits of the Nodosaria Sand and lower Nodosaria Sand, Reservoir A, were as shown on the attached plats. According to the plats, the area covered by the reservoir was plus or minus 160 acres and plus or minus 375 acres respectively. According to all three orders, the Commissioner found that the drilling units would "reasonably assure to each separate tract included therein an opportunity to recover its just and equitable share of the contents of the reservoir." The Commissioner found that each separate tract within the units would share in "unit production on a surface acreage basis of participation."

Kerr-McGee argues that the rule prohibiting collateral attacks is not applicable because "geographic" rather than "geologic" boundaries were established by the unit orders. Kerr-McGee contends that in the real world, gas and oil reserves are not rectangular-shaped as they are depicted on the plats in the present case.

21

Despite Kerr-McGee's argument, it has not provided, nor have we been able to locate, jurisprudence showing that the collateral attack doctrine contains an exception for orders establishing "geographic" rather than "geologic" units.

Kerr-McGee's expert, James Hardwick (hereafter Hardwick), admitted at trial that in his appearance before the Commissioner at the hearing on May 23, 2000, regarding the establishment of the proposed units, he truthfully stated, under oath, that the units proposed by the applicant were fair and reasonable and would ensure to each owner the opportunity to recover his just and equitable share of the reservoir content. The record is devoid of testimony or evidence establishing that Hardwick told the Commissioner, as Kerr-McGee avers, that its proposed units "did not establish reservoir boundaries." Moreover, we can find no testimony or evidence in the record that Hardwick advised the Commissioner, as Kerr-McGee submits, that the acreage within its units differed from the size of the actual reservoir. Clearly, Kerr-McGee cannot opportunistically change their position simply because it is not now to their advantage.

Kerr-McGee contends that Hayes Fund is incorrect in stating that the Commissioner's orders "include factual findings of the reservoir boundaries." Our review of the record, including Hardwick's testimony, reflects that it was made abundantly clear at trial that the unit orders specifically state that the reservoir "limits are shown on the attached plat."

As previously noted, the collateral attack doctrine provides that the Commissioner's order, as well as any findings under it, cannot be attacked outside of East Baton Rouge Parish and must be filed in proceedings brought against the assistant secretary of the Office of Conservation. In his order, the Commissioner made his specific findings regarding the parameters of the Hackberry reservoir and

22

those parameters were reflected in the plats attached to his order. To suggest that the Commissioner's unit orders did not state the reservoir limits is to simply ignore the plats attached to his order. Thus, Kerr-McGee's argument is without merit.

In this case, the Commissioner's orders are clear and unambiguous with respect to the reservoir boundaries. Filing a lawsuit against the assistant secretary of the Office of Conservation is the exclusive way to change unit orders according to Louisiana law. In this matter, Kerr-McGee did not sue the assistant secretary of the Office of Conservation; rather, it has attempted to change the size of the reservoir via the current litigation. This is unequivocally a prohibited collateral attack upon the Commissioner's orders. The trial court erred as a matter of law by finding that such a collateral attack was permissible. We find that the Commissioner's orders defining the size of the reservoirs are binding on all parties.

Additionally, the fact that the unit orders in this matter were a product of a compromise between Kerr-McGee and landowners including Hayes Fund is compelling. Kerr-McGee's expert, Hardwick, testified that there is a portion of the hydrocarbon-bearing zone as well as the aquifer which was outside of the unit boundary. Hardwick testified that this portion was not included in the unit in order to achieve a compromise with the landowners. The parties' compromise reflected their agreement on the unit configuration that was fair and equitable to all.

As a compromise, the unit orders are binding on Hayes Fund and Kerr-McGee. *See* La.Civ.Code art. 3071. Since we hold that Kerr-McGee is liable for Hayes Fund's lost production and royalty income, the compromise between the parties and the applicability of the collateral attack doctrine requires us to fix damages based on the reservoir sizes set forth in the unit orders.

23

In order to fix damages in the present case, we look at *Frankel v. Exxon Mobil Corp.*, 04-1236 (La.App. 1 Cir. 8/10/05), 923 So.2d 55, for guidance. In *Frankel*, the sublessors brought an action against the sublessees, alleging that the sublessees breached the mineral sublease and failed to reassign the mineral lease to them before it terminated. Following a bench trial, the trial court entered judgment for the sublessors and awarded them $799,804.00 for the loss of past and future overriding royalties that they would have received under the lease. Following an appeal by both the sublessees and sublessors, the first circuit affirmed the trial court's award for the loss of past and future overriding royalties. In affirming the trial court's judgment, the first circuit was guided by the following law and jurisprudence regarding calculation of damages:

> If a mineral lease is violated, an aggrieved party is entitled to any appropriate relief provided by law. LSA-R.S. 31:134. An obligor is liable for the damages caused by his failure to perform a conventional obligation. A failure to perform results from nonperformance, defective performance, or delay in performance. LSA-C.C. art. 1994. Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived. LSA-C.C. art. 1995. The measure of damages that the lessor (obligee) sustains because of a breach by the mineral lessee (obligor) of its implied obligation to act as a prudent administrator is the value of the minerals or royalties the lessor would have received had the lessee complied with his obligation under the lease. *See Williams v. Humble Oil & Ref. Co.*, 290 F.Supp. 408, 422 (E.D.La.1968), *aff'd and remanded for further proceedings*, 432 F.2d 165 (5th Cir.1970), *cert. denied sub nom. Humble Oil & Ref. Co. v. Price*, 402 U.S. 934, 91 S.Ct. 1526, 28 L.Ed.2d 868 (1971). Damages for lost profits must be proven to a reasonable certainty and must not be based on evidence that is speculative or conjectural. *See Pelts & Skins Exp., Ltd. v. State*, 97-2300 (La.App. 1st Cir.4/1/99), 735 So.2d 116, 126-28, *writs denied*, 99-2036 & 2042 (La.10/29/99), 748 So.2d 1167 & 1168.

*Id*. at 64.

Keeping the above principles in mind, we examine the factual situation revealed by the evidence in this case. The overriding royalty computations with

24

respect to the Rice Acres well were prepared by Griffin, Hayes Fund's expert. Griffin prepared a spreadsheet outlining the actual income generated from the production of the Rice Acres well versus the income that would have been generated had the Rice Acres well been prudently operated. Griffin's calculations focused upon one zone of damages which was located at a depth of 9446 feet to 9482 feet. Griffin utilized a time period from September of 1999 through March of 2011. In computing the actual income, Griffin took into account a 2.47% monthly decline rate over this period.[8] Griffin measured the monthly volume of gas production,[9] the monthly volume of condensate production,[10] and the costs associated with each.[11] Griffin found that the total monthly volume of gas production was 2,387,268 MCF. Griffin found that the total monthly volume of condensate production was 155,158 BBL. The monthly costs associated with gas production ranged from $2.13 per MCF to $12.76 per MCF. The monthly costs associated with condensate production ranged from $14.56 per BBL to $131.23 per BBL. Griffin obtained the gross monthly income realized by the Rice Acres well by multiplying the monthly volume of gas production by the monthly price of gas per MCF. To that amount, Griffin added the amount obtained after multiplying the monthly volume of condensate production by the monthly price of condensate per BBL. Griffin found that the actual gross income generated by the Rice Acres well

---

[8] According to Griffin's testimony, the decline rate schedules how reserves are going to be produced over time.

[9] The unit of measurement for the volume of natural gas is the MCF. Thus, Griffin measured the volume of gas production using MCFs. MCF equals a thousand cubic feet.

[10] The unit of measurement for the volume of oil is the BBL. Thus, Griffin measured the volume of condensate using BBLs.

[11] According to the spreadsheet, Griffin calculated both the gas production and condensate production without using a severance tax after December 1, 2005.

was $12,633,193.00.  Griffin then multiplied the gross income by both 64.8%[12] and

25%.  Importantly, 25% represents Hayes Fund's one-fourth ownership interest in

the oil and gas royalties as per the lease.  Utilizing the foregoing, Griffin found that

the actual income generated from the Rice Acres well during this time period was

$2,046,577.00 (i.e., $12,633,193.00 x .648 x .25 = $2,046,577.00).

Griffin next calculated the amount that Hayes Fund should have received

had the Rice Acres well been prudently operated.  Similar to the analysis

performed above, Griffin took into account a 2.47% monthly decline rate from

September of 1999 through March of 2011.  Griffin measured the monthly volume

of gas production, the monthly volume of condensate production, and the costs

associated with each.  The spreadsheet admitted into evidence indicates identical

monthly volumes of gas and condensate production as the actual monthly volumes

of gas and condensate production until and including January 2000.  Beginning

with February 2000, the monthly volumes of gas and condensate production

increased in comparison to the monthly volumes of gas and condensate production

noted regarding the actual income. [13]    Additionally, Griffin calculated the

condensate production in terms of 50 BC/MMCF[14] after October 2004.[15]  Taking

---

[12] According to Griffin's testimony, recoverable minerals are the minerals one expects to extract from a given reservoir.  Griffin testified that the oil and gas industry recognizes that one will rarely extract 100% of the minerals from a given reservoir.  Rather, Griffin testified that in this case, only approximately two-thirds of the minerals will be extracted, or 68%.  Griffin further testified that in order to calculate the lost recoverable minerals, he must first calculate the total recoverable minerals and then deduct from that amount the ones that were recovered versus the ones that were lost.  Griffin testified that 68% is conservative given the higher percentages advocated by some of the defense experts.  Griffin testified that the literature he reviewed ranged in percentages from 64% to 71.8%.  Thus, we assume that the 64.8% referenced in Griffin's spreadsheet accounts for the percentage of recoverable minerals in the Rice Acres well.

[13] According to Griffin's testimony and evidence, the Rice Acres well-producing rate was not affected by water as of January 2000.

[14] BC means barrel of condensate.  MMCF means one million standard cubic feet of natural gas.

26

into consideration the foregoing changes, Griffin found that the total monthly volume of gas production was 7,718,923 MCF. Griffin calculated the total monthly volume of condensate production as 514,143 BBL. Griffin obtained the gross monthly income that should have been realized by the Rice Acres well by multiplying the monthly volume of gas production, had the Rice Acres well been prudently operated, by the monthly price of gas. To that amount, Griffin added the amount obtained after multiplying the monthly volume of condensate production, had the Rice Acres well been prudently operated, by the monthly price of condensate. Griffin found that the gross income of the Rice Acres well, had it been prudently operated, was $52,596,140.00. Griffin then multiplied the gross income by both 64.8% and 25%. Utilizing the foregoing, Griffin found that the income that would have been generated from the Rice Acres well, had it been prudently operated during this time period, was $8,520,575.00 (i.e., $52,596,140.00 x .648 x .25 = $8,520,574.68).[16]

Finally, Griffin subtracted the total actual income realized from the Rice Acres well from the total income that should have been realized by the Rice Acres well, had it been prudently operated from September 1999 through March 2011. Griffin found that Hayes Fund was entitled to $6,473,997.00 in damages to the Rice Acres well, which represented their overriding one-fourth royalty interest (i.e., $8,520,575.00 - $2,046,577.00 = $6,473,998.00).[17]

---

[15] According to Griffin's testimony, October 2004 is when the well went off of production.

[16] Although $52,596,140 x .648 x .25 = $8,520,574.68, Griffin rounded up and found that damages were $8,520,575.

[17] Although $8,520,575.00 - $2,046,577.00 = $6,473,998.00, Griffin found that damages were one dollar less, i.e., $6,473,997.00.

As to the Hayes Lumber well, Griffin calculated two zones of damages. The first zone encompassed a depth of 9890 feet to 9995 feet. Griffin testified that he took into account a decline rate of 2.47% each month from the initial probable water-free production. Griffin calculated the damages similar to the calculations he performed on the Rice Acres well. Specifically, he looked at both the monthly volumes of gas and condensate production, the monthly cost associated with each, and the gross income with each. Griffin utilized the monthly volumes of actual gas and condensate production arising from another zone of damages, i.e., 9718 feet to 9730 feet, in his formulation.[18] The monthly gas price ranged from $2.91 to $12.76 per MCF, whereas the monthly condensate price ranged from $35.50 to $131.23 per BO.[19] Griffin took into account the condensate yield which was based on a linear decline of yield.[20] Griffin obtained the gross monthly income realized in this zone of the Hayes Lumber well by subtracting the actual monthly volume of gas production from the other zone of damages, i.e., 9718 feet to 9730 feet, from the monthly volume of gas production from the instant zone, i.e., 9890 feet to 9995 feet. Griffin multiplied the foregoing amount by the monthly gas price for a total gross income of $8,240,817.00 attributable to the gas production in this zone. As for the gross income attributed to the condensate production in this zone, Griffin subtracted the actual monthly volume of condensate production from the other zone of damages, i.e., 9718 feet to 9730 feet, from the monthly volume of condensate production from the instant zone, i.e., 9890 feet to 9995 feet. He

---

[18] Griffin measured the actual monthly volume of gas production in both MCFs and BCs in his formulation.

[19] BO is the barrel of oil volume measurement.

[20] This was measured as BC/MMCF according to the spreadsheet.

multiplied the foregoing amount by the monthly condensate price for a total gross income of negative $947,210.00 attributable to condensate production in this zone. He added both the gross income for gas and condensate which equates to $7,293,607.00 (i.e., $8,240,817.00 + (- $947,210.00) = $7,293,607.00). Griffin then multiplied the foregoing amount by both .695[21] and 25%, which equates to $1,267,264.00 (i.e., $7,293,607.00 x .695 x .25 = $1,267,264.22)[22] in damages to this zone. Once again, Griffin's damages only account for Hayes Fund's one-fourth ownership interest in the royalties.

The second zone of damage to the Hayes Lumber well encompassed a depth of 9718 feet to 9730 feet. Griffin calculated the damage similar to the calculations he performed on the other zone. Specifically, Griffin's calculations encompassed a period from April 2015 through December 2022. He took into account the monthly volume of gas and condensate production, the monthly gas and condensate price, and the gross income for each. He utilized a condensate yield based on a linear decline of yield and measured in terms of BC/MMCF.[23] Griffin calculated the total gross income of the gas and condensate as $15,003,801.00 and $17,782,582.00, respectively. He added the foregoing amounts together which equates to $32,786,383.00 (i.e., $15,003,801.00 + $17,782,582.00 = $32,786,383.00). He multiplied the foregoing amount by .695 and .25. Thus,

---

[21] We assume 69.5% represents the amount of recoverable minerals one can expect to extract from a reservoir, especially since Griffin testified that the industry recognizes that one will rarely extract 100% of the minerals from a given reservoir. Griffin testified that in this case, only approximately two-thirds of the minerals will be extracted. Griffin testified that his utilization of two-thirds recovery was conservative given scientific literature which suggests that the recoverability rate can be as high as 90%.

[22] Although $7,293,607.00 x .695 x .25 = $1,267,264.22, Griffin rounded down and did not include the twenty-two cents in his damage calculation.

[23] The spreadsheet indicates that this condensate yield utilized an initial yield of 7,330 BC/60,862.

Griffin found that this zone sustained $5,696,634.00 in damages (i.e., $32,786,383.00 x .695 x .25 = $5,696,634.05).[24] As he did with his other calculations, Griffin's damages only account for Hayes Fund's one-fourth ownership interest in the royalties.

Thus, Griffin found that the total loss for both zones in the Hayes Lumber well equates to $6,963,898.00 (i.e., $1,267,264.00 + $5,696,634.00 = $6,963,898.00). Griffin found that the total damages to both one zone of the Rice Acres well and two zones of the Hayes Lumber well equates to $13,437,895.00 (i.e., $6,963,898.00 + $6,473,997.00 = $13,437,895.00). Accordingly, Griffin's testimony and evidence shows that $13,437,895.00 was the total loss Hayes Fund suffered due to having their one-fourth overriding royalties reduced as a result of the imprudent operations of the Rice Acres and Hayes Lumber wells.

Based on our review of the record, Griffin's methodology and computations were supported by numerous scholarly articles, spreadsheets, graphs, et cetera, supporting his damage calculations. Thus, his damages for lost profits were "proven to a reasonable certainty" and were not "based on evidence that is speculative or conjectural." *Frankel*, 923 So.2d at 64. As in *Frankel*, losses attributable to the diminished overriding royalties are an appropriate measure of damages. We conclude that the record lacks any evidence of any other mechanism to measure the damages. Accordingly, we award damages to Hayes Fund in the amount of $13,437,895.00.

---

[24] Even though $32,786,383.00 x .695 x .25 = $5,696,634.05, Griffin rounded down and did not include the five cents into his damage calculation.

## VII.   Proof of Causation With Respect to Lease Provisions – Hayes Lumber Well Lower Zone Completion

In its fourth assignment of error, Hayes Fund contends that the trial court erred in ruling that it had to prove that Kerr-McGee's operations were imprudent since the leases provided that the landowners only had to prove causation and damages.  This assignment of error stems from the trial court's denial of Hayes Fund's lost profits claim resulting from the abandonment of the Hayes Lumber well lower-zone completion.  The trial court denied its claim finding that Kerr-McGee's use of the three simultaneous permanent packers was not imprudent. Thus, the trial court ruled that Hayes Fund did not prove fault or negligence, and, as such, could not recover lost royalties from the lower zone of the Hayes Lumber well.

Hayes Fund submits that Kerr-McGee is absolutely liable for all surface damages and subsurface reservoir damages pursuant to the lease, and its responsibility was not limited by its imprudent operations.  Hayes Fund alleges that the trial court's erroneous finding is based upon its interpretation of paragraph eight of the lease between Rice Acres, Inc., as the lessor, and HSR, as the lessee. Paragraph eight provides, in pertinent part:  "The Lessee shall be responsible for all damages ~~to timber and growing crops of Lessor~~ caused by Lessee's operations."

In examining the signed lease, paragraph eight reflects that the clause, "to timber and growing crops of Lessor" was stricken from the lease provision.  Thus, the provision reads, "Lessee shall be responsible for all damages caused by Lessee's operations."

The trial court in its reasons concluded as to the stricken language:

After reading the text of the lease, the Court finds that this change does not impose strict and/or absolute liability on the defendants for

"all" damages without reference to the remainder of the contract. There is an obligation owed to the plaintiffs by the defendants under the lease: not to cause damage to their property during the drilling operations of the collective defendants. However, the plaintiffs must still prove at trial that the operations of the defendants were imprudent and these imprudent operations were the cause of the damages suffered. Paragraph 8 of the lease imposes the duty owed to the plaintiffs by the defendants, but that is only one part of the burden of proof that HAYES FUND ultimately bears during trial.

Questions regarding contractual interpretation involve questions of law and are reviewed de novo. *Boykin v. PPG Indus., Inc.*, 08-117 (La.App. 3 Cir. 6/18/08), 987 So.2d 838, *writs denied*, 08-1635, 08-1640 (La. 10/31/08), 994 So.2d 537. In Louisiana, a contract establishes the law between the parties. *Corbello v. Iowa Prod.*, 02-836 (La. 2/25/03), 850 So.2d 686. The courts are bound to interpret contracts based upon the common intent of the parties. *Boykin*, 987 So.2d 838. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La.Civ.Code art. 2050. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made into the parties' intent." *Corbello*, 850 So.2d at 693.

The lease provides that the Lessee shall be responsible for all damages caused by Lessee's operations. Exhibit A to the lease sets forth additional paragraphs that include terms and provisions not contained in the original lease. Paragraph EE of Exhibit A provides that the Lessee is responsible for all damages caused by Lessee's operations "*including, but not limited to* damages to the surface of the land, timber, crops, pastures, . . . water wells and improvements." (Emphasis added.)

The trial court's reasons state that Hayes Fund must prove "that there was an obligation owed to them by the defendants; that the defendants failed to perform

32

that obligation; and that the failure resulted in damages to the plaintiffs." The trial court then noted that after reading paragraph eight of the lease, the deletion "does not impose strict and/or absolute liability on the defendants for 'all' damages without reference to the remainder of the contract." Despite the deletion, the trial court found that Hayes Fund was still required to prove that Kerr-McGee's operations "were imprudent and these imprudent operations were the cause of the damages suffered." We find that the trial court's conclusion in this regard was legally incorrect.

Based on our review of the jurisprudence, lease, and trial record, we find that Kerr-McGee was absolutely liable when it knowingly agreed that "Lessee shall be responsible for all damages caused by Lessee's operations." This absolute liability was initially limited to damages to Hayes Fund's timber and growing crops. Those limitations, however, were struck from the lease. By adding Exhibit A, which includes paragraph EE, Kerr-McGee's responsibilities were expounded upon rather than limited. Since the words of the lease are clear and explicit and lead to no absurd consequences, "no further interpretation may be made into the parties' intent." *Id.*

Accordingly, the trial court legally erred in ruling that Hayes Fund was required to prove that Kerr-McGee's operations were imprudent when the leases provided that the landowners only had to prove causation and damages.

**DECREE**

The judgment rendered by the trial court is reversed. The defendants, Aspect Resources, LLC; Noble Energy, Inc.; Crimson Exploration Operating, Inc.; Southern G. Holdings, L.L.C.; Anadarko Petroleum Corporation; Kerr-McGee Oil & Gas Onshore, LP; and Kerr-McGee Rocky Mountain, LP, are liable to plaintiffs,

33

Rice Acres, Inc.; the Hayes Fund for the First Methodist Church of Welsh, L.L.C.; Hollis Kay Hayes Hassien; Terry Glen Hayes; Cody William Hayes; Jodi Lee Hayes Oliver; and Lori Beth Hayes Lemons for damages in the amount of $13,437,895.00. All costs of this appeal are assessed against the foregoing defendants.

**REVERSED AND RENDERED**.

34